**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| CABLE & WIRELESS USA, INC., et al., | ) | Substantively Consolidated |
| | ) | |
| Debtors. | ) | Case No. 03-13711 (KJC) |
| | ) | |
| | ) | Ref. Docket No. 2887 & 2895 |

**APPELLEE'S SUPPLEMENTAL DESIGNATION OF ITEMS**
**FOR INCLUSION IN RECORD ON APPEAL**

Pursuant to Rule 8006 of the Federal Rules of Bankruptcy Procedure, appellee, the trustee of the Omega Liquidating Trust, created pursuant to the order confirming the plan of liquidation in the chapter 11 cases of Cable & Wireless USA, Inc. and its affiliated debtors, files this Supplemental Designation of Items for Inclusion in the Record on Appeal.

The following item is pertinent and should be added to the record on appeal:

| Docket No. | Document |
|---|---|
| 2621 | Transcript of hearing on October 12, 2005 |

Dated:    February 27, 2006
          Wilmington, Delaware

Respectfully submitted,

WINSTON & STRAWN LLP
Eric E. Sagerman
Rolf S. Woolner
333 South Grand Avenue, 38th Floor
Los Angeles, California 90071
Telephone: (213) 615-1700
Facsimile: (213) 615-1750

WINSTON & STRAWN LLP
Todd J. Dressel
Brian Y. Lee
101 California Street
San Francisco, California  94111
Telephone: (415) 591-1000
Facsimile: (415) 591-1400

            -and-

YOUNG, CONAWAY, STARGATT &
TAYLOR, LLP

Robert S. Brady (No. 2847)
Edmon L. Morton (No. 3856)
Margaret B. Whiteman (No. 4652)
The Brandywine Building
1000 West Street - 17th Floor
P.O. Box 391
Wilmington, Delaware  19899
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Co-Counsel  for  AlixPartners,  LLC  as
Trustee of the Omega Liquidating Trust

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                              .    Chapter 11
                                    .
CABLE & WIRELESS USA, INC.,         .    Case No. 03-13711(RB)
*et al.,*                           .    Substantively Consolidated
                                    .
            Debtors.                .    October 12, 2005
                                    .    2:30 p.m.
                                    .    (Wilmington)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE RANDOLPH BAXTER
UNITED STATES BANKRUPTCY COURT JUDGE

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1              THE CLERK: All rise.

2              THE COURT: Be seated, please.

3              MR. MORTON: Good afternoon, Your Honor.

4              THE COURT: Good afternoon.

5              MR. MORTON: Edmond Morton from Young, Conaway,

6    Stargatt, and Taylor on behalf of the Omega Liquidating

7    Trust.  I will be proceeding upon the amended agenda that we

8    filed last week, Your Honor.

9              THE COURT: Okay.  Just one moment, please.

10             MR. MORTON: Certainly.

11             THE COURT: You may proceed.

12             MR. MORTON: Thank you.  Your Honor, as is our

13   typical custom, we have requested the adjournment of several

14   matters.  A separate motion was filed to that effect.  Only

15   two of which we actually have comments about today, unless

16   Your Honor has questions.  The first one being matter number

17   6, which is the objection that we had filed to the claim of

18   MGE UPS Systems.  As we indicated to chambers this morning,

19   late last evening we did actually reach a resolution of that

20   matter with the claimant.  I have a stipulation and order to

21   present to the Court today.  I understand that it's Your

22   Honor's practice that all the orders simply be handed up at

23   the end of the hearing, so I won't approach with the order,

24   but it - - the order merely provides that the claim will be

25   fixed in an amount that is agreed to by the parties, and that

1   all other claims will be mutually released between the

2   parties.

3           THE COURT: Very well.  So we're going to forgo the

4   adjournment to November 13th on this one.

5           MR. MORTON: I'm sorry, Your Honor?

6           THE COURT: Initially, you were going to file a

7   motion to adjourn this matter to November 14th.

8           MR. MORTON: Correct, Your Honor.  And that motion

9   has actually been filed and granted, however the relief that

10  was granted by Your Honor will be muted by the present

11  stipulation, and it will not be calendared for the 14th.

12          THE COURT: Very well.

13          MR. MORTON: Your Honor, we are in a similar

14  situation with matter number 10 on the agenda, which is the

15  objection we filed to the claim of Glotel, Inc.  Again, late

16  last evening, we managed to reach a resolution of the claim

17  amount with that claimant and have a similar order to present

18  to the Court at the end of the hearing that will fix the

19  claim at an agreed amount and otherwise release the claims

20  amongst the parties.

21          THE COURT: Fine.  Thank you.

22          MR. MORTON: Thank you, Your Honor.  That takes us

23  to the uncontested portion of the agenda.  We understand that

24  the Court has already entered an order approving matter

25  number 12, which was our settlement with GSI Equipment, Inc.

1    Matter number 13 was listed as uncontested because at the

2    time of the agenda we had not received any response from the

3    claimant.  We did receive an informal request to work through

4    some issues with Coudert Brothers after the agenda was filed.

5    We have reached agreement with them on an acceptable amount

6    for the reduction of both the unsecured claim and the

7    administrative claim that were the subject of the objection.

8    And a consensual form of order will be handed up at the end

9    of the hearing with respect to that matter.

10          THE COURT: Fine.

11          MR. MORTON: Your Honor, that takes us to the

12    contested portion of the hearing.  If we may, we have been

13    asked by one claimant, and I believe it to be appropriate, to

14    take the agenda slightly out of order.  Matter number 16 is

15    now simply a status conference with the Texas Comptroller's

16    office.  As we do have a contested matter that will likely

17    take some time for testimony and argument, we've been

18    requested to push that matter to the beginning so that he

19    doesn't have to remain on the phone for the entire hearing.

20    If that's acceptable to Your Honor, the status - -

21          THE COURT: I don't recall setting this as a status

22    conference.

23          MR. MORTON: Correct.  They're simply - - the

24    parties are simply going to put a schedule in place before

25    Your Honor, ask Your Honor to approve the schedule, and then

1  he'll be able to hang up the phone and not bill his client

2  for the remainder of the hearing.

3          THE COURT: Very well.  Who's present on the phone?

4          MR. BROWNING(Telephonic): Your Honor, it's Mark

5  Browning, an Assistant Attorney General from State of Texas,

6  and I represent the Texas Comptroller of Public Accounts.

7          THE COURT: Good afternoon, sir.  Mr. Browning, is

8  it?

9          MR. BROWNING(Telephonic): Yes, Your Honor.

10          THE COURT: There's also counsel here at the

11  lectern, would you state your name for the record, please?

12          MR. WOOLNER:  Yes, Your Honor.  Good afternoon.

13  Rolf Woolner of Winston and Strawn, LLP for the Omega

14  Liquidating Trust.

15          THE COURT: Mr. Woolner.  Actually, it is your

16  client that has filed the objection to a claim of the Texas

17  Comptroller of Public Accounts.  I'll hear from you first.

18          MR. WOOLNER: Certainly, Your Honor.  Both the

19  objection and the Texas Comptroller's response have been

20  filed.  The Trust and the Comptroller have been in contact

21  about how most effectively to proceed.  And what we propose

22  to do is as follows, Your Honor.  The first step that we

23  propose to do is to have the Trust's tax consultant meet with

24  the auditor at the Comptroller's office to discuss whether or

25  not, at a business level, the issues reflected can be

1    resolved.  The earliest that that meeting can take place is

2    October 21st, when the auditor is next available, and a

3    meeting has already been established.  We then propose to

4    spend the following week attempting to see if this matter can

5    be settled, and we'll be setting up either a conference call

6    or an in person settlement conference the last week of

7    October.  In the event that we cannot resolve it through

8    settlement, we then propose to take the few depositions that

9    have been discussed in the first week or two weeks of

10   November, which would leave only the question of when Your

11   Honor wishes to hear the matter.  Again, assuming that we

12   reach a point and have not been able to resolve it.  We hope

13   that at a minimum we may be able to streamline the issues

14   that remain in dispute.

15        THE COURT: Now, this is purely a contested matter,

16   not an adversary proceeding?

17        MR. WOOLNER: That is correct, Your Honor.

18        THE COURT: Very well.  Mr. Browning, you've heard

19   the comments of Mr. Woolner, do you have further comment?

20        MR. BROWNING(Telephonic): No, not really, Your

21   Honor.  This was discussed among counsel this morning, and

22   that schedule is agreeable to us.  We also discussed the

23   amount of trial time that we anticipate may be necessary to

24   resolve this matter, and I think there's a little bit of

25   uncertainty in that area.

1          THE COURT: Very well.

2          MR. WOOLNER: Yes, Your Honor.  It is the Trust's

3   view that the hearing on these issues should certainly not

4   take more than a day.  Mr. Browning has told us that it's his

5   view it will - - it may require up to two days.  Accordingly,

6   the question becomes one of scheduling that would be

7   convenient for the Court.

8          THE COURT: Mr. Woolner, the last date you mentioned

9   in this schedule that you just outlined would have the

10  parties meeting as late as when?

11         MR. WOOLNER: The last date - - I'm sorry, Your

12  Honor.

13         THE COURT: The parties would meet as late as when?

14         MR. WOOLNER: The meeting to discuss settlement

15  would occur late this month, with the first week, or possibly

16  two weeks, of November used for the depositions that - - if

17  they are necessary.  Which means that the parties would be

18  ready to proceed as early as the next omnibus hearing, which

19  is November 14th.  But that is a hearing set in the afternoon,

20  Your Honor, and given the possibility that this may require

21  more than just half a day, and indeed as you will hear, Mr.

22  Browning thinks it may require up to two days, that's what

23  led us to believe that it would be appropriate to spend some

24  time asking about availability on your calendar.

25         THE COURT: I think I'll give you a time in

1  December.  It will be the second week of December.  Mr. Hunt

2  (phonetic) can give you a more specific date and time, and

3  I'll ask her to block out a full day for the matter should it

4  not be resolved prior to that scheduled hearing date.

5         MR. WOOLNER: Very well, Your Honor.

6         THE COURT: All right?  With some allowance for a

7  carry on the following date if necessary.  Do you have

8  further comment, sir?

9         MR. WOOLNER: I do not, Your Honor.

10        THE COURT: Thank you, Mr. Woolner.

11        MR. BROWNING(Telephonic): Mr. Browning.  One brief

12  comment.

13        THE COURT: Yes.

14        MR. BROWNING(Telephonic): My estimate of two days

15  is based upon the pleadings as they stand today.  This is a

16  very detailed and very complex type tax audit, and there are

17  something like 15 substantive tax issues that at this point

18  are unresolved.  Should, through the parties meeting and the

19  settlement conferences, and perhaps even through the

20  depositions, the issues be narrowed, then it may well could

21  be tried in a day.  It's just that if we have to go to trial

22  on this - - to begin a trial tomorrow, based on our

23  experience, and the number of witnesses, I believe there

24  probably is as many as two witnesses on each side, and the

25  audit process here took place over about a 2½ year period, so

 1   some narrative description of what went on is also likely.

 2   If we had to go to trial now, I think it would take 2 days.

 3   We may be able to narrow the issues by the time of the trial,

 4   and keep it within a day.  And we'll endeavor to do that.

 5        THE COURT: I just remembered my Delaware docket is

 6   pretty congested, even through December.  I'll give you a

 7   December date, but the trial preceding - - the evidentiary

 8   hearing on this matter, should it proceed to that point, will

 9   be in Cleveland.  And you'll be notified accordingly.

10        MR. WOOLNER: Very well, Your Honor.

11        MR. BROWNING(Telephonic): Thank you, Your Honor.

12        THE COURT: Thank you Mr. Woolner.  Mr. Browning.

13        MR. BROWNING(Telephonic): Thank you, Your Honor.

14   Appreciate it.

15        THE COURT: Mr. Morton.

16        MR. MORTON: Yes, Your Honor.

17        THE COURT: You may proceed.

18        MR. MORTON: That brings us to matter number 14,

19   Your Honor, which is a motion filed by the Virginia

20   Employment Commission for leave to file a late proof of

21   claim.  So at this time I would cede the podium to the

22   Employment Commission.

23        THE COURT: Thank you.

24        MS. FOX: Good afternoon, Your Honor.  Stephanie Fox

25   of Klehr Harrison on behalf of the Virginia Employment

1    Commission.  I would like to introduce to Your Honor my co-

2    counsel, Mr. William Gray, who is sitting to the left at the

3    table, who is with the firm of Sands, Anderson, Marks, and

4    Miller.  We did file a motion seeking an order for admission

5    *pro hac vice* of Mr. Gray.

6          THE COURT: Very well.

7          MS. FOX: And I would ask that he would be able to

8    proceed.

9          THE COURT: Ms. Fox, thank you very much.

10         MS. FOX: Thank you.

11         THE COURT: That motion is granted.  Mr. Gray, you

12    may proceed.

13         MR. GRAY: Thank you, Your Honor.  Good afternoon.

14         THE COURT: Good afternoon.

15         MR. GRAY: If it may please the Court.  Yes, we are

16    here on behalf of the Virginia Employment Commission, or if I

17    may, the VEC at times.

18         THE COURT: All right.  Mr. Gray, let me ask before

19    you proceed further.

20         MR. GRAY: Please.

21         THE COURT: To what extent have you and the Trustee,

22    who's filed an objection to your motion, met to see if you

23    could resolve this matter?

24         MR. GRAY: Your Honor, we did have some

25    conversations, and I think that's what precipitated the - -

1    we had this set at an earlier hearing.  We continued the

2    hearing to today's date in an attempt to basically determine

3    if this tax had been paid.  There was some belief, and Mr.

4    Woolner I think can talk to this too, that they thought that

5    - - when they realized what the claim was that we want leave

6    to file late, they believe that it was paid.  It's a big

7    claim, 5 hundred and some thousand dollars, and it was

8    believed - -

9         THE COURT: I thought it was 428 thousand in the

10    papers.

11         MR. GRAY: Excuse me.  That is correct.  It is a 4

12    hundred some thousand dollar claim.  Still big.  And we

13    figured that that was a big figure that if our respective

14    clients got together, perhaps they could find the payment.

15    The respective clients did in fact get together, the payment

16    has not been found.  Is - -

17         THE COURT: Address your comments to the Court, sir.

18    Do you have further comment?

19         MR. GRAY: On the attempted resolution, no.  No.

20    But, so I would proceed with the motion?  With - -

21         THE COURT: I have reviewed the motion.  If you have

22    further comments, feel free to - -

23         MR. GRAY: Oh, thank you.

24         THE COURT:  - - highlight any aspects of it.

25         MR. GRAY: Thank you, Your Honor.  Again, this is

 1   pursuant to 9006(b)(1).  And the Supreme Court in Pioneer

 2   Investment Services Company v. Brunswick Associates has given

 3   us the instructions on how we determine what is excusable

 4   neglect in order for a claimant to file a late claim.  The

 5   Supreme Court in Pioneer in fact reversed that.  They first

 6   looked at neglect, and then they looked at what is excusable.

 7         THE COURT: I'm familiar with the standards under

 8   Pioneer.

 9         MR. GRAY: Okay.  And as far as neglect, Your Honor,

10   we would say at best this is a mistake.  I have with me today

11   Mr. Ronald Hudson with the Virginia Employment Commission.  I

12   don't believe that there are really contested issues or facts

13   here, and so I would offer that I would just state what the

14   testimony would be.

15         THE COURT: You may make your proffer.

16         MR. GRAY: Thank you.  So, what happened here, back

17   in like 1992 at least, the Virginia Employment Commission had

18   an employer by the name of Cable & Wireless.  In 1999, a

19   separate, distinct employer, Digital Island, also became an

20   employer with the Virginia Employment Commission.  The

21   Virginia Employment Commission deals with the unemployment

22   insurance tax in Virginia.

23         THE COURT: Did they use the same Business

24   Identification Number?

25         MR. GRAY: No.  Not at that point, Your Honor.  It

1    was two separate companies, two separate account numbers.

2    There are a hundred and seventy some thousand employers in

3    the Commonwealth of Virginia.  The only way the Virginia

4    Employment Commission can keep track of them is by account

5    number, basically.  So at this point in time, we've got two

6    separate employers with the Virginia Employment Commission.

7    Each filing reports, until one point, Cable & Wireless, filed

8    a report that said, We have no employees.  Well, if you have

9    no employees, you have no tax.  Then, subsequently, there was

10    apparent there was a merger.  I guess Cable & Wireless, USA,

11    Inc. purchased Digital.  And that was in I believe February

12    or January perhaps of 2002.  A month later, apparently,

13    Digital was renamed Cable & Wireless Internet Services, Inc.

14    Now, they never - - still had the same Digital account

15    number.  And so as far as the VEC was concerned, it was still

16    dealing with an employer with a certain account number.

17            THE COURT: Which was different from the Debtors.

18            MR. GRAY: Correct.  That they had a - -

19            THE COURT: I understand during the course of this

20    relevant time period, Mr. Gray, that the Digital Island,

21    Incorporated, was filing various tax reports to your office.

22    Is that not correct?

23            MR. GRAY: They did, Your Honor.  As well as there

24    were other communications too.  They - - and I believe Mr.

25    Woolner will state, and as part of - - there's an exhibit to

1    the opposition that has the particular tax return in question

2    attached.  It's not a signed one, but it did indeed have, at

3    the - - up at the top of that report, Cable & Wireless

4    Internet Services, Inc. maybe prints as f/k/a, formerly known

5    as, Digital.  Well, here's the problem with that, Your Honor.

6    These reports are scanned.  Reports are due quarterly, so 4

7    times a year the VEC is getting 170 thousand reports.  And so

8    they - - they get - - there's an account technician that

9    receives these.  If they're clean and can be scanned, they're

10   put through a machine that picks up the account number.  Not

11   the name that's printed there.  So it's still always dealt

12   with on the account number basis.  Now apparently - -

13         THE COURT: Is there ever, Mr. Gray, any manual

14   processing as opposed to the digital processing, to pick up

15   any other names?  By the VEC?

16         MR. GRAY: To pick up other names?  Not that I - -

17         THE COURT: You mentioned in one of the upper right

18   hand corners there was Cable & Wireless f/k/a Digital Island,

19   Incorporated, right?

20         MR. GRAY: Correct.

21         THE COURT: At any time during the relevant time

22   period would anyone from VEC have made a manual inspection of

23   the papers to determine that these were one in the same?

24         MR. GRAY: Not for those reports, Your Honor,

25   because they would have been manually read and fed into a

1    machine which would pick up the account number, and therefore

2    it's in the system, and the other data that's picked up is

3    the amount of tax and the number of employees.

4              THE COURT: You may proceed.

5              MR. GRAY: All right.  Now, we believe that the

6    initial notice of Cable & Wireless bankruptcy was received

7    somewhere at the VEC.  Another problem we've got is there are

8    account offices throughout the state, and the VEC receives

9    mailing and notices at a lot of different areas.  We believe

10   the notice was received because the Cable & Wireless, if you

11   will, employer in the system was flagged bankruptcy.

12             THE COURT: Did the Debtor schedule a claim due and

13   owing to the VEC?

14             MR. GRAY: I believe the Virginia Employment

15   Commission was scheduled.

16             THE COURT: In what amount?

17             MR. GRAY: We were looking for that this morning,

18   Your Honor.  I don't know.  I checked - - we checked the

19   Cable & Wireless Internet Services, Inc. and we did not see

20   the Virginia Employment Commission scheduled for that

21   particular Debtor.  I have not checked the other Debtors.

22   But we believe - -

23             THE COURT: At any point in time has Digital Island,

24   Incorporated been the subject of a bankruptcy filing?

25   Separate and apart from the current Debtor?

1          MR. GRAY: None to our knowledge.

2          THE COURT: Okay.  You may proceed.

3          MR. GRAY: So the VEC is receiving reports and

4    letters from both employers, and always they are dealing with

5    the account numbers.  Now - -

6          THE COURT: Let me go back to an earlier point, Mr.

7    Gray.  You mentioned that the Debtors scheduled an amount due

8    and owing to VEC?

9          MR. GRAY: Well, Your Honor, they - -

10         THE COURT: But you are not certain as to the

11   amount?

12         MR. GRAY: Let me back up on that if I may.  I'm

13   sorry.  I believe that they scheduled somewhere the Virginia

14   Employment Commission.  When I first got this case from my

15   client - -

16         THE COURT: I think you responded to my question.

17   Next question is this, with knowledge that the Debtors

18   scheduled VEC as a claimant on its bankruptcy schedules, has

19   VEC ever taken an opportunity to consider whether or not - -

20   strike that.  Has VEC ever opposed the claim that was

21   asserted by the Debtor in its petition schedules?

22         MR. GRAY: Your Honor, the VEC has done nothing in

23   the Cable & - - any Cable & Wireless case that's consolidated

24   here, up until our motion for leave to file a late claim.  We

25   didn't file any claim in the Cable & Wireless case, because

1    that entity had no employees, therefore no tax.  So there was

2    no reason for the VEC to file a claim against that employer.

3         THE COURT: Did the VEC, at any point in time,

4    receive any communications to inform the VEC that there had

5    been a merger of Digital Island and Wireless - - Cable &

6    Wireless?

7         MR. GRAY: Not to our knowledge, Your Honor.  We did

8    look for that in the documents and records of the VEC.  To

9    the contrary - -

10        THE COURT: Under the regulations of the VEC, would

11   it have been a requirement of the employers serviced by the

12   VEC?

13        MR. GRAY: Mr. Ron Hudson, who is here as a witness,

14   has nodded his head yes that there is such a regulation.

15        THE COURT: Do you need a moment to consult, sir?

16        MR. GRAY: If I may.  Thank you.  Your Honor, when

17   companies merge or are acquired, they are required to report

18   that to the VEC if they're going to change the account

19   number.  And there's a subsequent change in their rate.

20        THE COURT: How would the affected employers know of

21   that requirement?

22        MR. GRAY: Well, Your Honor, I'm not sure that

23   ignorance of the law would absolve them from the duty to know

24   of the requirement to report that.  There's a lot of

25   communications that are sent from the VEC telling them of

1    their requirement to file the reports, etcetera.  But in this

2    regard, though, Your Honor, I would reference a letter that

3    the VEC received subsequent to the merger and name change.

4    That was, let's see here, Exhibit C to my motion.

5              THE COURT: Okay.

6              MR. GRAY: Again, we believe that the merger - -

7              THE COURT: What is the import of Exhibit C to your

8    motion?

9              MR. GRAY: You have that, Your Honor?

10             THE COURT: You may give me the import of it.

11             MR. GRAY: It's dates June 26th, 2002, which is

12   subsequent to the name change of Digital from Digital to

13   Cable & Wireless Internet Services.  But you will see it's a

14   letter to the Virginia Employment Commission.  It is on

15   Digital Island letterhead.  It says Digital Island acquired

16   another company, Exodus.  So again, upon receipt of this

17   correspondence, the account technician at the VEC would look

18   at the account numbers that are there and check to see if

19   there would be any change in the tax rate for Digital because

20   of this particular Digital purchasing Exodus.  But my point

21   is that again, even after this name change, the VEC is still

22   receiving information and things about Digital, and it just

23   had no indication whatsoever that it needed to file a proof

24   of claim in the bankruptcy case of Cable & Wireless for

25   Digital Island taxes that were due for 3rd quarter '03.

1          THE COURT: Take 2 minutes to conclude if you have

2     further comment.

3          MR. GRAY: I do.  I think the other issue here is

4     whether there's any prejudice to the Debtor or to the

5     Liquidating Trustee.  I think there is not.  As you can see

6     on today's calendar, there are still objections to claims

7     going on.  I mean we could file this claim.  If they wanted

8     to object to it, and they still think it's paid, then we'll

9     deal with it at that point.  I believe I have a report that

10    was filed, there is lots of money in the Trust that could pay

11    the claim.  There are preference actions recently paid, so

12    more money should be coming in.  They talk about not being

13    able to get documents.  This payment would have been made,

14    should have been made in April of 2003.  That's less than a

15    year before the filing of the bankruptcy.  So they should

16    have documents back to that point.  And it just makes sense

17    that they hold documents for about 3 years, because the IRS

18    can audit back 3 years.  So I don't believe that there is any

19    prejudice to the Debtor or the Liquidating Trustee, nor do I

20    think that it would substantially, or in any way affect, the

21    claims administration or the judicial proceeding.

22          THE COURT: Thank you very much.

23          MR. GRAY: Thank you, Your Honor.

24          THE COURT: Counsel, you may proceed.  Mr. Woolner?

25          MR. WOOLNER: Yes, Your Honor.  Thank you.  One of

1    the things that I hope has come through from Mr. Gray's

2    presentation is that we are talking about the same entity,

3    Digital Island, renamed Cable & Wireless Internet Services,

4    using the exact same Virginia Employment Commission account

5    number.  Using the exact same Federal Employer Identification

6    Number.  Filing a series of reports, every quarter,

7    identifying that the filer, as Cable & Wireless Internet

8    Services, formerly known as Digital Island, and showing both

9    the Virginia Employment Commission account number for Digital

10   Island/CWIS as well as the Employer Identification Number,

11   the unique number that every company has.

12          THE COURT: Mr. Woolner, I would assume that you and

13   Mr. Gray would have met outside of the earshot of the Court

14   to exchange documentation to satisfy that concern.  Did you

15   not?

16          MR. WOOLNER: The documentation is in fact attached

17   to our opposition, Your Honor.  There is the entire series of

18   the quarterly, of the quarterly filing - -

19          THE COURT: Just one second.

20          MR. WOOLNER: I beg your pardon?

21          THE COURT: Counsel, communicate in writing so as

22   not to be distractive.  You may proceed.

23          MR. WOOLNER: The series of all 4 filings from 2003

24   by Cable & Wireless Internet Services is attached as Exhibits

25   A through D to our opposition.  Each of those exhibits shows

1  all 3 of the pieces of information I have just mentioned.

2  That is the full name, as well as formerly known as Digital

3  Island, the Virginia Employment Commission account number for

4  Digital Island, and the Employer Identification Number

5  assigned by the IRS to Digital Island.  So that tracking

6  this, under any 3 - - any one of those three approaches would

7  have told someone what was going on.

8          THE COURT: Mr. Woolner, as far as submission of

9  these reports, the tax reports you are speaking of, is that

10  the same filing office that receives such reports, or are

11  there many different offices that the VEC as the recipient of

12  those reports?

13          MR. WOOLNER: That, Your Honor, I do not know.

14          THE COURT: You may proceed.

15          MR. WOOLNER: The - - one of the things that I want

16  to highlight, though, is that it wasn't just those quarterly

17  reports.  And as Mr. Gray has acknowledged, the VEC did

18  receive notice of the filing.  One of the things that I think

19  is important to remember is that this case was a case jointly

20  administered involving not one Debtor, not just Cable &

21  Wireless USA, but 6 Debtors.  And the notice of commencement

22  of the case, which apparently VEC did receive, shows all 6

23  Debtors, and just like the notice of claims bar date, which

24  is attached - -

25          THE COURT: And Digital Island was one of the co-

 1   Debtors?

 2          MR. WOOLNER: Digital Island is shown as a prior

 3   name for Cable & Wireless Internet Services on the notice of

 4   commencement of case.  As is the Employer Identification

 5   Number that is unique to Digital Island/CWIS.  So from the

 6   - -

 7          THE COURT: Mr. Woolner, you heard me ask Mr. Gray

 8   earlier if there was a requirement by the VEC for employers

 9   that came within its jurisdiction to make certain

10   notifications in cases of mergers, acquisitions, so forth.

11   Could you speak to that point, please?

12          MR. WOOLNER: What I heard - - yes, Your Honor.

13   What I heard Mr. Gray tell us was that according to Mr.

14   Hudson there was a requirement that a report occur if they

15   were going to change their account number.  Here, the

16   surviving - - the entity remained.  It was simply the name

17   that was changed.  The account number continued to be used.

18   It was the same entity with a different name.  Using the same

19   account number and the same Employer Identification number.

20          THE COURT: I understand pre-petition Digital Island

21   pre-petition, pre-acquisition by Cable & Wireless, Digital

22   had a separate number from Cable & Wireless.  Is that

23   correct?

24          MR. WOOLNER: That is correct, Your Honor.

25          THE COURT: And do I understand you to say now that

1    once those two entities merged, Digital continued to keep the

2    same number?

3            MR. WOOLNER: Correct.  Because Digital, Digital,

4    Cable & Wireless Internet Services continued to operate as a

5    separate entity, and it had separate employees.

6            THE COURT: And Digital, as a separate entity, also

7    had the requirement to make the same types of reports to the

8    VEC that Cable & Wireless was making?

9            MR. WOOLNER: Both entities made reports to the

10   Virginia Employment Commission.

11           THE COURT: To your knowledge were both entities

12   current with submission of those reports?

13           MR. WOOLNER: So far as I know, yes.  That is

14   correct.

15           THE COURT: As of the petition filing date?

16           MR. WOOLNER: As of the petition filing date, yes.

17   One of the questions that Your Honor posed that is relevant

18   is was the Virginia Employment Commission scheduled.  This

19   debt was not scheduled.  It - - I do not know if the then

20   current quarterly amounts that would be due to the VEC were

21   scheduled in December 2003, when the filings occurred.  I

22   would not be surprised if they were.

23           THE COURT: What amount was scheduled by the Debtor?

24           MR. WOOLNER: I beg your pardon, Your Honor?

25           THE COURT: What amount was scheduled by the Debtor

1    on behalf of - -

2            MR. WOOLNER: With respect to VEC - -

3            THE COURT:  - - Cable & Wireless as of the petition

4    filing date?

5            MR. WOOLNER: With respect to Cable & Wireless, the

6    answer would be nothing, Your Honor, because as of the end of

7    2002, all employees of Cable & Wireless USA were transferred

8    to Cable & Wireless Internet Services, so during 2003 - -

9            THE COURT: Whatever name it was.  Whatever was

10   filed - -

11           R. WOOLNER: Oh, for Cable & Wireless Internet

12   Services?

13           THE COURT: Let me finish my question, and listen

14   carefully, sir.  Whatever name was filed on the petition

15   schedules, be it for the principle Debtor or any of the

16   affiliated co-Debtor entities, was there a petition - - was

17   there a proof of claim filed by these co-Debtor entities on

18   behalf of VEC, and if so in what amount?

19           MR. WOOLNER: No proof of claim would have been

20   filed, Your Honor.  I do not know if there was a scheduled

21   amount.

22           THE COURT: Was the amount scheduled?

23           MR. WOOLNER: I do not know the answer to that

24   question, Your Honor.

25           THE COURT: Okay.

1          MR. WOOLNER: But I know only that the amount that

2     is in question here was not scheduled because the director of

3     tax of the Debtor entities, who is here today to testify if

4     necessary, was attempting from the time shortly before the

5     petition, to get her arms around exactly what did need to be

6     put into the papers in the first day orders, and this was not

7     something that was ever drawn to her attention.

8          THE COURT: Mr. Woolner, one of the papers, and it

9     could have been VEC's papers, mentioned that there was some

10    $75 million in play here that would be addressable to various

11    claims filed against the Debtors' estate.  Is that correct to

12    your knowledge?

13         MR. WOOLNER: The amount currently held by the

14    Liquidating Trust is in the tens of millions of dollars, Your

15    Honor, but that is reflective of the amounts that are

16    expected to be paid out to various creditors with claims that

17    are allowed.  And as you may know - -

18         THE COURT: At this juncture, has there been a

19    determination as to the total allowed claims that would be

20    addressed?

21         MR. WOOLNER: For the last year, Your Honor, we have

22    had 3 separate motions in which we have set out the maximum

23    reserve for each claim.  That is, the maximum amount at which

24    each claimant of which the Trust is aware could ever be

25    allowed.  The first was filed a year ago, the second earlier

1    this year, and the third a couple of months ago.  So in each

2    case, we have identified those claimants that are out there.

3    Not necessarily who will have allowed claims, but if they

4    have allowed claims, they will be no more than the amount set

5    forth.  VEC has not been scheduled.  Has not - - I'm sorry,

6    has not been listed on any of those, because there has not

7    - -

8         THE COURT: That's not my question.  That's not my

9    concern presently Mr. Woolner.  With the amounts that you

10   have just indicated that you have placed in different cohorts

11   for reserve payments addressed to allow claims, what amount

12   do those total?

13        MR. WOOLNER: May I consult with a - -

14        THE COURT: Sure.

15        MR. WOOLNER:  - - representative of the Trust, Your

16   Honor?  Your Honor, I am informed by Mr. Alan Dalass, a

17   representative of the Liquidating Trustee, that he believes

18   there is approximately $66 million available for all

19   creditors, if that was your question.

20        THE COURT: That's all creditors, including secured,

21   priority, and unsecured?

22        MR. WOOLNER: All creditors who will ultimately be

23   paid.  That will include secured, administrative, and

24   priority creditors as well as unsecured creditors.

25        THE COURT: Refresh my recollection at this point.

1   What is the status of the main case?

2          MR. WOOLNER: Well, the plan was confirmed on July

3   14th of last year.  The plan became effective on August 4th, at

4   which point the Debtors were dissolved and the Liquidating

5   Trust came into existence.  So these Debtors no longer have

6   had any - - they've disappeared.  The Liquidating Trust is

7   administering the claims.  The expectation was, in the

8   disclosure statement, that secured administrative and

9   priority claims would be paid in full, and that unsecured

10  claims, to the extent they granted the release, the optional

11  release to Cable & Wireless PLC a former parent of the

12  Debtors, that unsecured creditors would receive a

13  distribution of approximately 27½¢ per dollar of allowed

14  claim.

15         THE COURT: General unsecured?

16         MR. WOOLNER: General unsecureds.  Yes, Your Honor.

17         THE COURT: The claim of VEC, how is it

18  characterized?

19         MR. WOOLNER: It would be a tax claim, Your Honor,

20  and I suspect that it would be an administrative claim.  I'm

21  sorry, a priority claim.

22         THE COURT: Is that disputed?

23         MR. WOOLNER: It's disputed that there is a claim,

24  but if it were - - if it were to be allowed, it would be a

25  tax claim, so it would be in the group that gets paid first.

1          THE COURT: If you would take 2 minutes to conclude,

2     sir.

3          MR. WOOLNER: Certainly.  Your Honor, the one thing

4     that was said that I must take issue with on Mr. Gray's part

5     was that there would be no prejudice.  One of the things that

6     appears in our opposition papers was that we believed there

7     was a risk that there would be limited access to individuals

8     and documents if this claim were allowed to be filed.  Mr.

9     Gray was correct that business representatives of both the

10    VEC and the Trust have conferred.  One of the things that

11    that process has confirmed is that it is very difficult for

12    the Trust to be able to now respond.  I will make a proffer

13    if I may of what Ms. Barbara Swayze, who is the individual

14    with whom Mr. Hudson from VEC has been speaking about, about

15    what she would testify if permitted to.  May I do so, Your

16    Honor.

17         THE COURT: You may proceed.

18         MR. WOOLNER: Your Honor, Ms. Swayze would make the

19    following - - would offer the following testimony.  She is

20    the former Director of Tax of the Debtors from 1985 to 1997.

21    She went away for other employment, and was brought back in

22    November of 2003 to act as a consultant, and in effect

23    Director of Tax as they prepared for the bankruptcy filing,

24    made the filing, and then went through the case.  She

25    continues to be employed as a consultant to the Liquidating

1   Trust now, and worked in a transition capacity with Savvis

2   Inc., which was a purchaser of most of the assets of the

3   Debtors' during the case.  She would testify that from the

4   time of the petitions through confirmation, the Debtors had

5   no record that this amount now being sought was due to the

6   VEC.

7          THE COURT: This amount being sought, 428 thousand?

8          MR. WOOLNER: The amount for the first quarter of

9   2003, unemployment insurance taxes.  Yes, Your Honor.

10  Whether it's a larger amount or that amount.  But they have

11  no record that anything was due for that.  And she would

12  testify that the Liquidating Trust's ability now to analyze

13  and respond to this claim is inferior to what it would have

14  been had this claim been timely filed in June of 2004 for at

15  least 5 separate reasons that have become clear over the last

16  few weeks as she and Mr. Hudson have dealt directly.  First,

17  the most knowledgeable individual with respect to

18  unemployment insurance taxes for these Debtors was a lady

19  name Cindy Williams, with whom Ms. Swayze worked last Fall,

20  that is the fall of 2004 on behalf of the Liquidating Trust.

21         THE COURT: Do you have a written proffer of this

22  individual?

23         MR. WOOLNER: Of Barbara Swayze or - -

24         THE COURT: Yes.

25         MR. WOOLNER: Yes I am for Ms. Swayze who's present.

1           THE COURT: Do you have her proffer in writing?

2           MR. WOOLNER: I don't have a written proffer, Your

3    Honor.  I have only what I can give you - -

4           THE COURT: You still have two minutes - -

5           MR. WOOLNER: Okay.

6           THE COURT:  - - less than two minutes to conclude,

7    counsel.

8           MR. WOOLNER: Very well.  The most knowledgeable

9    individual who was available a year ago is no longer

10   reachable.  Multiple attempts have been made by Ms. Swayze

11   and others to reach her unsuccessfully.  Second, the computer

12   systems with the relevant information, which were transferred

13   to Savvis, are no longer - - have been decommissioned by

14   Savvis, and are no longer being supported.  That means - - in

15   addition, the personnel at Savvis who were used to support

16   those no longer used systems, have also been laid off.  Which

17   means there is no longer personnel, and there are no longer

18   the computer systems to get access to the records that relate

19   to this.  The paper records that belong to these Debtors were

20   packed up, and we do not now know - - Ms. Swayze does not now

21   know where they are.  They were packed up at the end of

22   August, 2004, and it is not known where they are.  Finally,

23   the Debtors' personnel who have knowledge of those paper

24   records relating to such matters as the unemployment

25   insurance claims, who were familiar with this, were all let

1  go as of - - the last of them was let go by the end of 2004.

2  The bottom line, Your Honor, is that there is substantial

3  prejudice in being asked now to deal with this claim because

4  whereas it could have been dealt with fairly readily before,

5  the information is just not available.  And that's - -

6          THE COURT: Thank you.

7          MR. WOOLNER:  - - what Ms. Swayze would testify to.

8          THE COURT: Thank you Mr. Woolner, Mr. Gray.  I've

9  heard equally from both parties.  I'll take this matter under

10  advisement and my ruling will issue.  Thank you.  Mr. Morton,

11  there is one additional matter here.  I believe there was an

12  objection - - a motion to extend the claims objection

13  deadline by Omega Liquidating Trust which was opposed by GLT.

14          MR. MORTON: That is correct, Your Honor.  And we

15  - -

16          THE COURT: Is that still before the Court?

17          MR. MORTON: It is.  And we have actually conferred

18  with GLT and have been advised that they withdraw their

19  objection upon the submission to the Court of a slightly

20  revised form of order.  The slightly revised form of order

21  simply consists of an addition that we will actually object

22  to the claim of GLT by November 1st.  And that otherwise they

23  have no opposition to the extension of the claims deadline.

24          THE COURT: I think the original request for

25  extension was to take it through the end of January 2006.  Is

1    that correct?

2             MR. MORTON: That's correct, Your Honor.

3             THE COURT: So now the Trust, Omega Trust is asking

4    for an extension through the end of November?

5             MR. MORTON: No.  That's - - Your Honor, GLT, as

6    also a liquidating estate - -

7             THE COURT: I understand.

8             MR. MORTON:  - - had many concerns about their

9    ability to defend against the claim.

10            THE COURT: What's the answer to my question?

11            MR. MORTON: So the answer to the question is with

12   respect to every other creditor in the case, we are still

13   seeking an extension into January of 2006.  That is

14   unopposed.  With respect to the GLT Liquidating Trust, we

15   have agreed that we will file whatever objections we have to

16   that claim by November 1.

17            THE COURT: That will be fine.  Without further

18   opposition, that objection is sustained, and you may submit

19   - - I'm sorry.  The motion to extend is granted.  You may

20   submit an entry accordingly.

21            MR. MORTON: And, Your Honor, I believe those are

22   all the matters that we have for today.

23            THE COURT: Thank you Mr. Morton.  Counsel.  We

24   stand adjourned.

25

1          I, Jennifer Ryan Enslen, approved transcriber for

2     the United States Courts, certify that the foregoing is a

3     correct transcript from the electronic sound recording of the

4     proceedings in the above-entitled matter.

5

6

    /s/Jennifer Ryan Enslen                    10/18/05
    Jennifer Ryan Enslen
    18 Bar Drive
    Newark, DE 19702
    (302) 836-1905